Carlos QUINTEROS, et al., Plaintiffs,

v.

**SPARKLE CLEANING, INC., et al., Defendants.**

**Civil Action No. AW–07–0628.**

United States District Court, D. Maryland, Southern Division.

Jan. 28, 2008.

Andreas N. Akaras, Akaras Law Offices, College Park, MD, Jeffery Charles Taylor, Michael J. Snider, Allan E. Feldman, Ari Taragin, Snider and Associates LLC, Baltimore, MD, for Plaintiffs.

Rebecca Newman Strandberg, Strandberg and Associates PA, Silver Spring, MD, Alisa H. Reff, Drinker Biddle and Reath LLP, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

ALEXANDER WILLIAMS, JR., District Judge.

Plaintiffs Carlos Quinteros, Iliana Mejia, and Pedro Santos, for themselves and others similarly situated (collectively "Plaintiffs"), have filed a complaint against Defendants Sparkle Clean, Inc. ("Sparkle"), Regal Cinemas, Inc. ("Regal"), Santos Bonilla, Dionisio Rivera, Sandra Y. Vasquez, and Jose Luis Bonilla (collectively "Defendants"), alleging violations of the overtime pay requirements under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Maryland Wage and Hour Law, Md. Lab. & Empl.Code § 3–403(a)(8), and the Maryland Wage Payment and Collection Law, Md. Lab. & Empl. § 3–505, and seeking collective and class action status under these respective statutes. Currently pending before the Court are Plaintiffs' Motion for Order Under Court Supervision Permitting Notice to Employees of Their Opt–In Rights (Docket No. 2), Defendant Regal's Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim (Docket No. 5), and Plaintiffs' Motion for Leave of Court to File Surreply Instanter (Docket No. 17). The motions have been fully briefed, and the Court has reviewed the entire record. A hearing on these motions was held on January 18, 2008. *See* Local Rule 105.6 (D.Md.2008). For the reasons stated be-

low, the Court will GRANT Plaintiffs' Motion for Order Under Court Supervision Permitting Opt–In Notice, GRANT Defendant Regal's Motion to Dismiss, and GRANT Plaintiffs' Motion for Leave to File Surreply Instanter.

## FACTUAL AND PROCEDURAL BACKGROUND

Carlos Quinteros, Plaintiff, along with several other similarly situated persons, filed a collective action suit against Defendants Sparkle, four managers of Sparkle, and Regal Cinemas. Defendant Sparkle Cleaning, Inc. ("Sparkle") is a janitorial services company that provides basic janitorial services on a permanent basis (i.e. emptying trash bins, vacuuming, etc.) as well as provides services on a per job basis, which it calls "special projects." For these "special projects," Sparkle has signed subcontract agreements with individuals to perform this type of work. When a "special project" would come along, Sparkle would contact its subcontractors to see if they were interested and available to work. These subcontractors, who would own their own equipment, could accept or decline any job. Sparkle has provided commercial cleaning services to various customers, including Regal Cinemas ("Regal"). In support of its contracts with Regal, Sparkle sends cleaning crews to individual movie theaters located in Virginia, Maryland, Pennsylvania, and the District of Columbia.

Plaintiffs, current and former employees of Sparkle, perform cleaning, janitorial, and maintenance services, and which have been rendered at Regal Cinemas. Plaintiffs customarily drive Sparkle's vehicles to various movie theaters and begin their work shifts in the late evenings, around 11:00pm, after the theaters have closed, and remain there until the morning around 10:30am. Their tasks include, among other things, cleaning carpets, theater seats, bathrooms and other areas of the cinemas.

Plaintiffs allege that their work is overseen by Regal's employees, who also direct Plaintiff's cleaning activities. Plaintiffs further allege in their complaint that both Sparkle and Regal are aware that Plaintiffs work more than forty hours per week and neither pays them proper overtime wages for their overtime work. Plaintiffs also allege in their complaint that they were not compensated for their time during travel and that they have to work through their breaks. Finally, Plaintiffs contend that Sparkle and Regal carry on a common scheme that unlawfully deprives Plaintiffs of their full wages.

On March 13, 2007, Plaintiffs filed their complaint in this Court against both Defendants. Along with their complaint, Plaintiffs also filed a Motion for an Order Under Court Supervision Permitting Notice to Employees of their Opt–In Rights, pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act ("FLSA") and Federal Rule of Civil Procedure 23. In response, Defendant Sparkle filed an Opposition Response to Plaintiffs' Motion. Also, Defendant Regal filed a Motion to Dismiss for Failure to State a Claim under Federal Rule of Civil Procedure 12(b)(6) and for Lack of Subject Matter Jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

## STANDARD OF REVIEW

*Motion to Dismiss for Failure to State a Claim, Fed. R. Civ. Pro. 12(b)(6)*

It is well established that a motion to dismiss under Fed. R. Civ. P Rule 12(b)(6) should be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining whether to dismiss a complaint, a court must view the material allegations in a light most favorable to the plaintiff, with the

alleged facts accepted as true. 2A Moore's Federal Practice, 12.07 [2.–5] (2d ed.1987); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 304–21 (1990). Moreover, the allegations will be construed liberally in favor of the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The issue in reviewing the sufficiency of the pleadings in a complaint is not whether a plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support the claims. *Id.*

*Motion to Dismiss for Lack of Subject Matter Jurisdiction, Fed. R. Civ. Pro. 12(b)(1)*

■ A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction may be founded on either of two bases. As with a motion to dismiss under Rule 12(b)(6), a Rule 12(b)(1) motion to dismiss may challenge subject matter jurisdiction by demonstrating that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Russell v. Continental Restaurant, Inc.,* 430 F.Supp.2d 521, 523 (D.Md.2006) (quoting *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)). With this type of 12(b)(1) motion, the "facts in the complaint are assumed to be true, and the plaintiff, in effect, is afforded the same procedural protection as [it] would receive under a Rule 12(b)(6) consideration." *Id.* Thus, the "moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg, & Potomac R.R. Co. v. U.S.,* 945 F.2d 765, 768 (4th Cir.1991). In its analysis, the court must accept as true the factual allegations in the plaintiff's complaint, and the motion should be granted only " 'if it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Star Scientific, Inc. v.*

*R.J. Reynolds Tobacco Co.,* 174 F.Supp.2d 388, 391 (D.Md.2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

■ In the alternative, a Rule 12(b)(1) motion may assert a lack of subject matter jurisdiction "in fact" apart from any pleading. In such cases, a court may look beyond the allegations in the complaint to determine whether any evidence supports the exercise of jurisdiction. *Richmond,* 945 F.2d at 768; *see also Sharafeldin v. Maryland Dept. of Public Safety & Correctional Services,* 94 F.Supp.2d 680, 684–85 (D.Md.2000) (when a defendant challenges subject matter jurisdiction on a motion to dismiss, the court may consider evidence outside the pleadings without converting the motion to a motion for summary judgment). The district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Richmond,* 945 F.2d at 768.

■ Whether the defendant attacks jurisdiction under either theory, once the issue of subject matter jurisdiction has been raised, the plaintiff bears the burden of proving that subject matter jurisdiction exists in the federal courts. *Russell,* 430 F.Supp.2d at 523; *see also Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.,* 166 F.3d 642, 647 (4th Cir.1999).

## ANALYSIS

Plaintiffs have filed this suit for unpaid wages and overtime pay against the Defendants under the FLSA, the Maryland Wage and Hour law, and the Maryland Wage Payment and Collection law. Defendant Sparkle opposes this motion by primarily arguing that Plaintiffs are not entitled to seek court supervised notice in the absence of an employer-employee relationship. Defendant Regal, in its Motion

to Dismiss, argues that Plaintiffs are not employees of Defendant Regal nor are they joint employers with Defendant Sparkle. Furthermore, Defendant Regal maintains that it is exempt from the overtime provisions under the FLSA and Maryland Wage and Hour Law because of the "movie theater" exemption.

To resolve Plaintiffs' first motion, the threshold issue that the Court must determine is whether the relationship status between Plaintiffs and Defendant Sparkle is that of employee/employer or independent contractor.

A. *Plaintiffs as "Employees" or "Independent Contractors" of Defendant Sparkle*

■ The determination of whether an individual is an employee or an independent contractor is a legal question under the FLSA. *Schultz v. Capital Int'l Sec. Inc.*, 466 F.3d 298, 304 (4th Cir.2006); *see also Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 713–14, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). The FLSA was enacted to "protect the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999). Since the FLSA is "remedial and humanitarian in purpose," it should be interpreted broadly so as to effectuate its goals. *Id.* The Act defines the verb *employ* expansively to mean to "suffer or permit to work." 29 U.S.C. § 203(g); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 89 L.Ed. 301 (1945) ("the broadest definition [of 'employ'] that has ever been included in any one act"). The FLSA, in addition to mandating a minimum wage for covered employees, requires the payment of overtime for each hour worked in excess of forty hours per work week. 29 U.S.C. §§ 206(a)(1), 207(a)(1).

■ The Supreme Court has instructed courts to construe the terms "employer" and "employee" expansively under the FLSA. *Nationwide*, 503 U.S. at 326, 112 S.Ct. 1344; *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The FLSA defines an *employer* as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. 203(d). Likewise, an *employee* is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). This definition stretches "the meaning of 'employee' to cover some [workers] who might not qualify as such under a strict application of traditional agency [or contract] law principles." *Id.*; *Nationwide*, 503 U.S. at 326, 112 S.Ct. 1344.

■ Determining whether an entity is an employer or whether an employee is covered, for the purposes of the FLSA, turns on the "economic reality" of the relationship between the employee and the putative employer. *Schultz*, 466 F.3d at 304; *see also Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947). The crux of the analysis is whether the worker is "economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Id.* (internal quotations omitted). The determination of an employment relationship "does not depend on ... isolated factors but rather upon the circumstances of the whole activity." *Rutherford*, 331 U.S. at 730, 67 S.Ct. 1473. Moreover, the labels that parties themselves attach to their relationship are not controlling; even if a contract clearly defines the relationship as one of client/subcontractor, it may still constitute an employer/employee relationship for purposes of the FLSA. *Herman v. Mid–Atlantic*

*Installation Serv. Inc.*, 164 F.Supp.2d 667, 671 (D.Md.2000); *Ansoumana v. Gristede's Operating Corp.*, 255 F.Supp.2d 184, 190 (S.D.N.Y.2003) ("An employer's characterization of an employee is not controlling ... for otherwise there could be no enforcement of any minimum wage or overtime law."); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1545 (7th Cir.1987) ("The FLSA is designed to defeat rather than implement contractual arrangements.... '[E]conomic reality' rather than contractual form is indeed dispositive.").

 Courts have established a six-factor test to determine whether a worker is an employee or an independent contractor, based on "economic reality." These factors are:

1) the degree of control that the putative employer has over the manner in which the work is performed;

2) the worker's opportunities for profit or loss dependent on his managerial skill;

3) the worker's investment in equipment or material, or his employment of other worker;

4) the degree of skill required for the work;

5) the permanence of the working relationship; and

6) the degree to which the services rendered are an integral part of the putative employer's business.[1]

*Schultz*, 466 F.3d at 304–05; *see also Herman*, 164 F.Supp.2d at 671. No single factor is dispositive and a "mechanical" application of the factors is unwarranted; rather, the Court will apply these factors looking at the totality of the circumstances "to capture the economic realities of the relationship between the worker and putative employer." *Schultz*, 466 F.3d at 305; *Herman*, 164 F.Supp.2d at 671; *see also Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir.2003); *see also Johnson v. The Unified Gov't of Wyandotte County*, 371 F.3d 723, 729 (10th Cir.2004).

*1. Control*

 The first *Silk* factor is the degree of control that the putative employer has over the manner in which the work is performed. Plaintiffs argue that Defendant Sparkle controlled and directed Plaintiffs' work activities. According to Plaintiffs, Sparkle set their schedules and instructed and directed Plaintiffs to the work sites where they would perform their cleaning activities. Plaintiffs also argue that they were required to fill out time sheets in order to receive their hourly wages and that Sparkle could hire or fire them at-will. Sparkle, on the other hand, maintains that they did not exert any control on the Plaintiffs as subcontractors, as the only time it would use them would be for "special projects." They assert that the subcontractors would go to the job site and perform the services that he or she was contracted to do. Looking at these allegations from Plaintiffs' complaint, which must be taken as true, it seems that Sparkle did control Plaintiffs and their work, in setting schedules, instructing them how to work, where they were to work, hiring and firing, and filling out time sheets, among other things.[2]

---

**1.** These factors are often referred to as the "*Silk* factors," in reference to the Supreme Court case from which they derived. *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

**2.** Defendant Sparkle makes generic denials to Plaintiffs allegations throughout their opposition and does not put forth anything specific relating to these particular Plaintiffs. Sandra Vasquez, a manager of Sparkle, stated in her affidavit that Sparkle's main offices in Fairfax, Virginia, had been broken into, and many of their documents and original records had been stolen and are no longer available, including those relating to these Plaintiffs.

### 2. Opportunity for profit or loss dependent on managerial skill

Plaintiffs next argue that they had no opportunity for profit or loss from their employment with Sparkle. Plaintiffs contend that they were paid an hourly wage, and they had no profit incentive to do their work on any type of on-time or early-time budgets. Plaintiffs also argue that they did not have any managerial capacity while on the job. Defendant Sparkle argues that a subcontractor had an opportunity to effect his or her own profit or loss depending on whether the worker had other individuals performing services for Sparkle. Sparkle provides an example of this by submitting an exhibit to the Court in the form of a check stub, with principal payment to Plaintiff Pedro Santos. While the check was made out to Mr. Santos, it included amounts to several other individuals who were to be paid by paid Mr. Santos. Defendants also contend that a worker could affect his profit or loss from his or her ability to accept or decline work, namely in that a worker could accept or refuse jobs to increase his profits or effect his losses.

Plaintiffs reply to this by stating that Mr. Santos was directed by Sparkle to cash the check in this format and pay the other named individuals on its behalf. They further claim that Mr. Santos never negotiated or demanded that he pay these employees as if they were his employees or partners. Considering this evidence, it does not seem that Plaintiffs had any opportunity for profit or loss, mainly from the fact that they were paid by the hour, and the reason for the multiple-payment check stub to Santos is still disputed.

### 3. Investment in equipment and employment of others

Plaintiffs argue that they did not purchase any materials or equipment to perform their jobs nor did they employ others to help them carry-out their jobs. They maintain that they were provided cleaning equipment and materials by Sparkle and that Sparkle trained them on this equipment. Also, Plaintiffs were transported to their work locations in a Sparkle-owned vehicle. Defendants argue that all of their subcontractors are required to purchase his or her own equipment, which costs around $3,000. On occasion, Sparkle would allow a subcontractor to borrow Sparkle's equipment if the subcontractor's equipment is broken. This factor would weigh heavily in favor of independent contractor status if the Plaintiffs actually bought their own equipment, but there is no evidence by Defendant to this fact, and Plaintiffs deny ever having bought their own equipment.

### 4. Degree of skill required

Janitorial building maintenance, i.e. cleaning floors, carpets, is not considered to be labor which requires a high degree of skill or technical expertise. While Sparkle tries to stress the importance of the cost of the machinery and certification on that machinery, the Court is unconvinced that the jobs of the Plaintiffs required as much skill as they have alleged.

### 5. Permanence of the working relationship

Plaintiffs argue that they worked for Sparkle as at-will employees on a continuous basis and did not work for any other employers. Defendants, on the other hand, simply maintain that subcontractors are only used for "special projects," and that some have stopped taking projects because the work is too infrequent. This factor is not readily discernible from the facts, but it seems that from the evidence put forward by Plaintiffs, mainly in the form of their check payment stubs, that Plaintiffs had an exclusive relationship

with Sparkle and there was continuity during the period with which they worked.

### 6. Integral part of the business

Sparkle and Regal have entered into a recurring contract in which Sparkle provides cleaning services on a regular basis at twenty-four of Regal's theaters. This agreement provides that Sparkle is to be paid a flat rate for each week of cleaning performed at Regal's theaters. Plaintiffs argue that this contract is significant to Sparkle. Plaintiffs assert that they simply show up for work and do as they are told. They contend that their work activities are similar to those of Sparkle's other employees and that there is no significant difference in work activities associated with janitorial building maintenance. Defendants argue that the subcontractor work comprised a small part of Sparkle's businesses. They have a staff of around twenty-five employees and about five or six subcontractors for "special projects."

Taking in all of these factors into consideration, the Court believes that the "economic realities" show that Plaintiffs are indeed employees of Defendant Sparkle, and at this preliminary stage, there is a basis to define the relationship as that of employer/employee.[3]

### I. PLAINTIFFS' MOTION FOR ORDER UNDER COURT SUPERVISION PERMITTING NOTICE TO EMPLOYEES OF OPT–IN RIGHTS

■■■■ Since the Court has determined that Plaintiffs are employees and not independent contractors of Sparkle, the Court will now address Plaintiffs' Motion for Court Facilitated Notice. Under the FLSA, plaintiffs may maintain a collective action against their employer for violations under the act pursuant to 29 U.S.C.

§ 216(b). Specifically, the provision states that:

> An action ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). This provision establishes an "opt-in" scheme, whereby potential plaintiffs must affirmatively notify the court of their intentions to be a party to the suit. *Camper v. Home Quality Management, Inc.,* 200 F.R.D. 516, 519 (D.Md. 2000). To effectuate the remedial purposes of the Act, it is well settled that district courts have discretion, in appropriate cases, to allow such claims to proceed as a collective action and to facilitate notice to potential plaintiffs. *Id.; see also Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 169, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). When considering a motion for opt-in notice, the "relevant inquiry is not whether the court has discretion to facilitate notice, but whether this is an appropriate case in which to exercise that discretion." *Camper,* 200 F.R.D. at 519.

■■■■ The first issue in determining whether to exercise that discretion is whether Plaintiffs have demonstrated that potential class members are "similarly situated." 29 U.S.C. § 216(b). Courts in this District have held that plaintiffs should be required "to make a preliminary factual showing that a similarly situated group of potential plaintiffs exists" before court assistance is granted. *Camper,* 200 F.R.D. at 519 (quoting *D'Anna v. M/A–*

---

**3.** Even though the contract that Plaintiffs signed labeled them as "subcontractors," this designation is not controlling on the Court as the circumstances described above show otherwise that they are employees of Sparkle. *See Herman,* 164 F.Supp.2d at 671.

*COM, Inc.*, 903 F.Supp. 889, 893–94 (D.Md.1995)). This would include factual evidence by affidavits or other means, but mere allegations in the complaint would not suffice. *Camper*, 200 F.R.D. at 519; *accord Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266–67 (D.Minn.1991) (reasoning that "as a matter of sound case management, a court should, before offering [to assist plaintiff in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable class exists. . . . Plaintiffs must submit evidence establishing at least a colorable basis for their claim that a class of 'similarly situated' plaintiffs exist.").

A group of potential plaintiffs are "similarly situated" when they together were victims of a common policy or scheme or plan that violated the law. *See D'Anna*, 903 F.Supp. at 894; *see also Jackson v. New York Telephone Co.*, 163 F.R.D. 429, 431–32 (S.D.N.Y.1995). However, "employees cannot be expected to have evidence of a stated policy of refusing to pay overtime." *Marroquin v. Canales*, 236 F.R.D. 257, 260–61 (D.Md.2006).

 In this case, Plaintiffs have put forth evidence, in the form of their payroll stubs, that show that they work more than forty (40) hours per week and that they are not paid time-and-a-half for overtime hours as required by federal and state law. Plaintiffs and the "putative" plaintiffs perform similar janitorial maintenance and cleaning services, their hours are kept through timesheets which are held by Defendant Sparkle, and they are uncompensated for their travel time between job locations. This shows that there may be a company-wide practice of not paying overtime to its employees.[4] Defendants do dispute Plaintiffs' allegations; however, factual disputes do not negate the appropriateness of court-facilitated notice. *Camper*, 200 F.R.D. at 520; *Severtson v. Phillips Beverage Co.*, 141 F.R.D. 276, 280 (D.Minn.1992) ("The fact that these allegations are disputed by the defendants does not mean that plaintiffs have failed to establish a colorable basis for their claim that a class of similarly situated plaintiffs exist.").

Based on the above standard, the Court finds that Plaintiffs have made the requisite factual showing that Plaintiffs are similarly situated and that there is a company-wide policy by Defendant Sparkle regarding their overtime pay.[5] Thus, the Court will allow Plaintiffs to proceed with their collective action.[6]

---

4. In Defendant Sparkle's Opposition, it states that it only has twenty-five employees whom it employs to conduct janitorial services on a permanent basis. *See also* Affidavit by Sandra Vasquez. Also, at the hearing, Plaintiffs stated that there may be around fifty employees. If this is true, then the Court agrees with the Plaintiffs in that it would not be too much of a burden for these employees to receive notice in the mail of the current FLSA action.

5. At the hearing, Defendant Sparkle submitted the case of *Parker v. Rowland Express, Inc.*, 492 F.Supp.2d 1159 (D.Minn.2007) in support of their argument. There, the court found that the plaintiffs had not proffered the requisite evidence showing that there were in fact other potential opt-in plaintiffs, and thus, did not certify the class. The Court here is unwilling to narrowly construe the pleading

requirements and believes that from the facts alleged, "conditional certification" is warranted here.

6. At this stage of the litigation, the Court will "conditionally certify" the class, which provides the putative class members and potential plaintiffs with notice and opportunity to opt-in to the ongoing litigation. The Court also encourages the parties to devise a scheduled notice that is balanced and fair to both sides. However, the Court will entertain, after discovery has largely been complete, a motion for "decertification" by the Defendants. If the record at that time shows that Plaintiffs are "similarly situated," the collective action may proceed. If it is found at that time that Plaintiffs are not similarly situated, the Court will decertify the class, and the

## II. DEFENDANT REGAL CINEMAS' MOTION TO DISMISS

Defendant Regal seeks dismissal of Plaintiffs' complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). They argue that Plaintiffs have failed to allege any facts in their complaint which would establish that Regal is in fact Plaintiffs' employer. Secondly, Regal argues that even if Plaintiffs' allegations were sufficient to conclude that Regal was their employer, Plaintiffs' claims would still fail as a matter of law because employees of movie theaters are exempt from the overtime requirements of both the FLSA [29 U.S.C. § 213(b)(27) ] and Maryland law [Md. Lab. & Empl.Code § 3–403(a)(8) ].

Plaintiffs, on the other hand, argue that Regal's employees, along with Sparkle, oversee and direct Plaintiffs' work activities at the movie theaters, thereby making them joint employers with Sparkle. In support of their position, Plaintiffs argue three main points. First, they argue that the legislative purpose of the FLSA goes against Regal's position because the FLSA strongly favors imposing liability upon an employer to satisfy the Act's remedial purposes. Second, Regal's exercise and control over the Plaintiff's work activities, along with the economic realities of the common-scheme put in place by Sparkle and Regal, render them a joint-employer for purposes of the FLSA. Third, Regal's claimed exemption is inapplicable because the conditions of Plaintiffs' employment require that the claimed exemption be narrowly construed against Regal.

### A. Joint Employment

Separate persons or entities that share control over an individual worker may be deemed *joint employers* for purposes of the FLSA. According to the Department

"opt-in" Plaintiffs will be dismissed without prejudice. *See Scott v. Aetna Services, Inc.,*

of Labor regulations that implement the FLSA,

> [i]f the facts establish that the employee is employed jointly by two or more employers, i.e. that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as *one employment* for purposes of the Act.

29 C.F.R. § 791.2(a) (emphasis added). The regulations also establish that a joint employment relationship exists in situations such as:

1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;

2) where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

3) where the employers are not completely dissociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. 791.2(b). Furthermore, "all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions...." 29 C.F.R. § 791.2(a). The ultimate determination of

210 F.R.D. 261, 264 (D.Conn.2002).

a joint-employer relationship will ultimately depend on the facts of each particular case. *Id.*

■ Since the employment relationship here does not neatly fit into one of the three categories mentioned above, the Court will look to the case law for guidance. While the Fourth Circuit has not explicitly devised its own test for "joint employment" under the context of the FLSA, it has considered a nine-factor test in interpreting the identical "joint employment" language in the FLSA, but as applied under the Agricultural Workers Protection Act ("AWPA"). *See Ricketts v. Vann,* 32 F.3d 71 (4th Cir.1994). These factors include: (1) ownership of the property and facilities where the work occurred; (2) degree of skill required to perform the job; (3) investment in equipment and facilities; (4) permanency and exclusivity of employment; (5) nature and degree of control of the workers; (6) degree of supervision, direct and indirect, of the work; (7) power to determine the pay rates or the methods of payment of the workers; (8) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (9) preparation of payroll records and payment of wages. *Ricketts,* 32 F.3d at 74; *see also Heath v. Perdue Farms, Inc.,* 87 F.Supp.2d 452, 457 n. 4 (D.Md.2000) (citing the "joint employment" test in *Ricketts* although not reaching the joint employment issue in the case).

The Fourth Circuit, later in *Schultz,* suggested that courts in this circuit to look to other tests derived from other circuits. *See Schultz,* 466 F.3d at 306, n. 2 (advising courts that it maybe be useful to consider the factors as listed in *Bonnette v. Calif. Health & Welfare Agency,* 704 F.2d 1465 (9th Cir.1983) and *Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61 (2d Cir.2003) to determine whether a joint employment relationship exists within the meaning of the Act and the regulation).[7]

The Second Circuit, in *Zheng,* considered the following factors in determining whether garment manufacturers who hired contractors, who then subsequently hired plaintiffs, to stitch, finish, and assemble clothing for numerous manufacturers, were joint employers under the FLSA: (1) whether the premises and equipment of the purported joint employer are used for the plaintiffs' work; (2) whether the contractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the process of production for the purported joint employer; (4) whether responsibility under the contracts could pass from one subcontract to another without material changes; (5) the degree to which the purported joint employer or their agents supervised the plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the purported joint employer.

*Zheng,* 355 F.3d at 72.

Similarly, the Ninth Circuit in *Bonnette,* devised the following four-factor test to determine if a joint-employment relationship existed, asking whether the proposed employer: (1) had the power to hire/fire the employees; (2) supervised/controlled employee work schedules or conditions of

---

**7.** While Regal cites to *Ricketts v. Vann* as the test used in the Fourth Circuit for joint employment, this case interprets "joint employment" as used in the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq,* and not the FLSA. There are other cases which specifically address the "joint employment" provisions of the FLSA, such as *Bonnette* and *Zheng,* and this Court will rely on those cases in its analysis.

employment; (3) determined the rate/method of payment; and (4) maintained employment records. *Bonnette*, 704 F.2d at 1470. Ultimately, the determination of joint-employment must be based upon the "circumstances of the whole activity." *Id.*

Under the aforementioned test articulated by the Fourth Circuit and similar tests articulated by other circuits, the facts of this case show that Regal Cinemas is not a joint employer with Sparkle Clean over the Plaintiffs. Again, as stated earlier, there must be an "economic reality" or dependency between the employee and the putative employer so as to find an employer-employee relationship. *Schultz*, 466 F.3d at 304. While Plaintiffs work at various Regal Cinemas in Maryland, Virginia, and the District of Columbia, it is Sparkle, not Regal, who sends them to these locations as part of its contract with Regal. Their work is not directly dependent on the work they perform at Regal, but depends on where Sparkles sends them—in this case, it just happens that Plaintiffs work at Regal. Also, Plaintiffs allege that their work is overseen by Regal, but this is nothing short of a conclusory statement unsupported by sufficient facts in the complaint. Plaintiffs do not depend solely on the business of movie theaters for their work, but rather depend on the business generated from Sparkle Clean who directs them to work at places like Regal Cinemas.

In their brief, and again at the hearing, Regal stated many ways in which they are not the joint employer of Plaintiffs. Regal argues that they do not prescribe any terms or conditions for the cleaning of theaters, do not set any pay rates or is involved in payroll matters for the cleaning crews, nor do they have any authority as to whom Sparkle hires or fires. If Regal has an issue or a concern about the cleaning being done by Sparkle at a particular theater, then Regal would contact one of Sparkle's managers. As part of the contract with Sparkle, Regal requires that Sparkle's employees clean the premises when the theaters are closed. Also, no employee of Regal supervises, trains, or instructs the members of Sparkle's crews with respect to the performance of cleaning services.

Plaintiffs rely heavily on *Zavala v. Wal–Mart Stores, Inc.*, 393 F.Supp.2d 295 (D.N.J.2005). There, the district court held that undocumented workers who provided janitorial services at various Wal–Mart retail stores, some of whom were direct employees of the maintenance contractors, could bring an FLSA claim against the defendant Wal–Mart. The court concluded that the plaintiffs had stated enough facts establishing an employment relationship with the defendant Wal–Mart to deny its motion to dismiss and because of the broad remedial purposes underlying the FLSA. Specifically, the court relied on the fact that all the named plaintiffs had worked at various Wal–Mart stores; that Wal–Mart exercised the power to hire and fire the plaintiffs, and control their wages, hours, and working conditions, as well as the quality standards that governed their work. *Zavala*, 393 F.Supp.2d at 331. Also, the court inferred that since the plaintiffs worked seven days a week and sometimes seventy hours each week, the plaintiffs did not work for any entities other than Wal–Mart. *Id.* Lastly, the court relied on the fact that the Wal–Mart's on-site managers were very involved in recording the "time and costs associated with maintenance functions, and forwarded along such information on a regular and periodic basis to Wal–Mart headquarters." *Id.* (internal quotations omitted).

The case *sub judice*, however, is somewhat different. While Plaintiffs worked at several of Regals' locations, Regal did not have the power to hire or fire the employ-

ees, control their wages or working conditions, and even if Regal did know how many hours Plaintiffs worked, Regal was not involved in any part of rendering the cleaning services performed by Plaintiffs. The facts alleged by Plaintiffs in their complaint with respect to their involvement with Regal do not show the same level of interrelation as the plaintiffs with Wal–Mart in *Zavala.*

While the policy underlying the FLSA suggests a broad application, the Court believes that in this case, it would be an untoward expansion of the FLSA doctrine to include Regal as a joint employer of the Plaintiffs. If what Plaintiffs argue were to prevail, it would virtually have the effect of converting every business entity that contracts with a janitorial cleaning company into its own "janitorial maintenance operation" after normal business hours, thus improperly subjecting it to the obligations under the FLSA. Taking Plaintiffs' argument to its logical extreme, the very courthouse where this Court resides would in effect transform into a janitorial maintenance operation after a full day's work of attending to its judicial functions, since cleaning crews promptly arrive by 5:30pm everyday after official Court business has closed for the day. As zealously as counsel for Plaintiffs has articulated Plaintiffs' case, the Court is unwilling to proceed in that direction. Therefore, the Court therefore believes that under the tests articulated and the facts alleged in Plaintiffs' complaint, Regal Cinemas is not a joint employer with Sparkle over Plaintiffs, and the complaint against Regal should be dismissed for lack of subject matter jurisdiction.[8]

### B. Movie Theater Exemption

Even if Plaintiff could establish facts that showed that Regal was their joint employer, Plaintiffs' complaint would still be dismissed against Regal because establishments like Regal are covered under the "movie theater" exemption of the FLSA and Maryland law, thus exempting them from having to pay overtime to their employees. *See* 29 U.S.C. § 213(b)(27); Md. Lab. & Empl.Code § 3–403(a)(8).[9] Plaintiffs, on the other hand argue that the movie theater exemption does not apply because exemptions should be narrowly construed against an employer, as the "nature of the work" performed at Regal Cin-

---

**8.** Several days after the hearing and right before the issuance of this Opinion, Plaintiffs submitted a "Post–Hearing Surreply Supplement" (Docket No. 25) with accompanying affidavits in support of their complaint. At the hearing, the Court did express concern over the sparse allegations of Regal's involvement with Plaintiffs for the issue of joint employment and subject matter jurisdiction. The Court assumes that Plaintiffs' Post–Hearing Supplement was a response to questions posed to counsel. The affidavits that were attached to the supplement contained statements from Plaintiffs directly refuting the statements made by Regal's managers in their brief, showing the likelihood that a joint employment relationship may have existed. While the Court stated at the hearing that Plaintiffs' Surreply brief would be accepted, which had been filed by Plaintiffs well before the hearing, the Court did not invite or re-quest any additional evidence or information from either party. The Court agrees with Regal that the proper time to have submitted these additional affidavits was with their Surreply motion. Lastly, under Fed.R.Civ.P. 6(b), this Court has broad discretion in accepting late-filed affidavits if the failure to acts was the result of excusable neglect. Since none has been shown here, and in fairness to Defendant, the Court will not accept Plaintiffs' Post–Hearing Surreply Supplement. *Orsi v. Kirkwood,* 999 F.2d 86, 91 (4th Cir.1993); *see also Slaughter v. Southern Talc, Co.,* 919 F.2d 304, 307 (5th Cir.1990) (court does not abuse its discretion when it refuses to accept out-of-time affidavits).

**9.** The Maryland Wage Payment Collection Law, Md.Code Ann., Lab. & Empl. § 3–505, does not have a similar "movie theater" exemption provision.

emas does not fall within the scope of the exemption.

The movie theater exemption states that "[t]he provisions of Section 207 of this title [the requirement to pay overtime] shall not apply with respect to ...—(27) any employee employed by an establishment which is a motion picture theater." 29 U.S.C. § 213(b)(27). Similarly, the Maryland Wage and Hour statute provides that "[t]his subtitle [Wages and Hours] does not apply to an individual who ...—(8) is employed in a motion picture or drive-in theater." Md. Lab. & Empl.Code § 3–403(a)(8). The accompanying regulations of the FLSA define "motion picture theater" as a "commercially operated theater primarily engaged in the exhibition of motion pictures with or without vaudeville presentations." 29 C.F.R. § 779.384.

 Whether an FLSA exemption applies in a given situation is ultimately a question of law. *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 450 (4th Cir. 2004). Also, the employer has the "burden of proving it falls within an exemption." *Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 291, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959). Furthermore, an exemption from the FLSA's remedial provisions must be narrowly construed against an employer who is asserting it, and its application is limited only "to those establishments [that are] plainly and unmistakably within [its] terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *see also Johnson v. City of Columbia, S.C.*, 949 F.2d 127, 129–30 (4th Cir.1991).

Searching the case law and legislative history reveals very little guidance for answering the question of the exact scope of the movie theater exemption. Neverthe-less, it is helpful to this Court to consider how courts have interpreted other exemptions, i.e. the amusement and recreational establishment exemption found in 29 U.S.C. § 213(b)(3), in order to shed light on this one.[10]

Plaintiffs rely on the holding in *Brennan v. Six Flags Over Georgia, Ltd.*, 474 F.2d 18 (5th Cir.1973). There, in a *per curiam* opinion, the court held that maintenance and repair employees of the defendant who worked at the theme park during the season were not exempt from minimum wage and overtime requirements of the FLSA in regards to new construction work as opposed to their normal maintenance and repair work. As a result, the defendant was required to pay these employees their appropriate wages within the FLSA. The court reasoned that it was the "nature [or character] of the work" and "not the source of the remuneration, that controls" and "gives rise to the need for an exemption." *Six Flags*, 474 F.2d at 19.

An important fact about the *Brennan* case is that several circuits, including the Fifth Circuit, have declined to follow the reasoning when applying "establishment-based" exemptions. *See Brennan v. Texas City Dike & Marina, Inc.*, 492 F.2d 1115 (5th Cir.1974). There the court concluded that, in construing the application of the amusement or recreational establishment exemption, the employer's "principal activity should be determinative of the marina's eligibility for an exemption," rather than the "nature of the work" performed by its employees. *Texas City Dike & Marina*, 492 F.2d at 1119; *see also Brennan v. Southern Productions*, 513 F.2d 740, 746–47 (6th Cir.1975) (citing *Texas City Dike & Marina, Inc.* in holding that it is the "principal activity of the show establishment"

---

10. Regarding the legislative history of the exemptions, there really seems to be no "unifying principle" underlying them. As the court stated in *Brennan v. Texas City Dike Marina,* *Inc.,* 492 F.2d 1115, 1117 (5th Cir.1974), the only conclusion that one that finds is that the "exemptions were created simply to ensure the Act's passage."

that determines whether the amusement and recreational exemption applies).

The Tenth Circuit, in *Hamilton v. Tulsa County Public Facilities Authority*, 85 F.3d 494 (10th Cir.1996), has simply rejected the reasoning of *Six Flags*. There, the court concluded that the amusement and recreational exemption applied to maintenance workers and security guards employed by the TCPFA, even though the type of work performed by the former employees was not traditional amusement or recreational work. It based its holding on the fact that it was the "character of the revenue producing activity which affords the employer the protection of the exemption" and not the "work performed at an amusement or recreational establishment." *Hamilton*, 85 F.3d at 497. The court specifically stated that it did not agree with the "broad statement" in *Six Flags* and "decline[d] to follow this view, especially in light of the Fifth Circuit's failure to do so" in *Texas City Dike & Marina*. *Id*. at 497, n. 3. *See also Marshall v. New Hampshire Jockey Club, Inc.*, 562 F.2d 1323, 1331 n. 4 (1 st Cir.1977) (disagreeing with the broad statement in *Six Flags* and noting that the § 213(a)(3) exemption turns on the nature of the employer's business and not on the nature of the work performed).

These holdings were reaffirmed by the Department of Labor in interpreting their own "establishment-based" exemptions, of which the movie theater is one of them. *See also* 29 C.F.R. 779.384. The then-Administrator of the Wage and Hour Division reaffirmed that it is the "nature of the employer's business, not the work performed by a particular employee" that "determines whether establishment-based exemptions ... apply" in concluding that Finance and Insurance salespersons who worked at a car dealership, although they did not actually sell automobiles, were nonetheless exempted from FLSA's overtime requirements under the "retail or service establishment" found at 29 U.S.C. § 207(i). FLSA Opinion Letter, March 17, 2003, 2003 WL 23374597, at *3. The Administrator went on to conclude that "[t]o the extent that could be read as inconsistent with this interpretation (*see, e.g. Brennan v. Six Flags Over Georgia, Ltd.*, 474 F.2d 18 (5th Cir.1973)), we disagree with them." *Id*.[11]

As such, this Court also agrees with the Administrator's interpretation of the "movie theater" exemption as "establishment-based," along with other courts that espouse that view, and further believes that Regal falls within its scope.[12] From the

**11.** Regal further argues that the "movie theater" exemption, being establishment-based, is determinative of the character of the establishment and not the nature of any individual employee's work. Section 29 C.F.R. § 779.302 (entitled "Exemptions depend on the character of establishment"), states that

Some exemptions depend on the character of the establishment by which an employee is employed. These include ... the exemptions available to the establishments of the character specified in sections 12(a)(3), (9), and 13(b)(8) (first part). Therefore, if the establishment meets the tests enumerated in those sections, employees "employed by" that establishment are generally exempt

from [the overtime requirements of the FLSA].

As Regal has correctly noted, this regulation was written prior to the 1974 amendments to the FLSA, where Congress renumbered the "move theater" exemption referenced in the regulation as § 13(a)(9) into the current regulation at § 13(b)(27). This same regulation thereby distinguishes other exemptions under the Act which require a showing of **both** the "character of the establishment" and "the nature of the conditions of the employment of the particular employee." 29 C.F.R. 779.302.

**12.** Plaintiffs cite to *Gossett v. Du–Ra–Kel Corp.*, 569 F.2d 869 (5th Cir.1978) for the notion that the reasoning in *Six Flags* has not totally been abandoned, when it cited *Six*

facts above, Regal is a "motion picture" theater whose principal work is that of showing movies to the general public, which exempts them from the FLSA (and Maryland) overtime provisions. Regal is by no means in the janitorial services business, and, by simply contracting with a cleaning crew to clean its facilities after hours fails, to change the character of its "movie theater" operation into something entirely different. Lastly, while the Court understands the remedial and humanitarian purpose of the FLSA, the decision of this Court not to impose liability on Regal does not run afoul to those stated objectives.

## CONCLUSION

For the reasons stated above, the Court concludes that Plaintiffs have alleged sufficient facts to support its Motion for Court Supervised Opt–In Notice, and that motion will be GRANTED. Plaintiffs have not alleged sufficient facts to establish the existence of a joint-employer relationship with Regal Cinemas, notwithstanding the fact that Regal Cinemas falls under the "movie theater" exemption, thus exempting it from the overtime provisions of the FLSA. Therefore, Defendant Regal Cinemas Motion to Dismiss will be GRANTED. Lastly, the Court will GRANT Plaintiffs' Motion for Leave to File Sur–Reply In-

stanter.[13] A separate Order consistent with this Memorandum Opinion will follow.

Flags and several other cases for the proposition that "an employee working within an exempt business must be paid at minimum wages or overtime rates if his work is of the type covered by the statute," and reiterating that the character of the work and not the remuneration controls whether an exemption is allowed. Gossett, 569 F.2d at 874. While the Fourth Circuit has yet to rule on this issue, the Court does not find the reasoning of Six Flags to be persuasive or affects the Court's analysis, especially in light of the stat-

ute, regulations, and subsequent case law interpreting the exemptions.

13. Generally, Sur–Reply memoranda are not permitted to be filed under Local Rule 105.2(a) (D.Md.2008). See also Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md.2003). However, in this instance, and considering Defendant Regal's lengthy Reply memorandum, which consisted of attaching new affidavits, the Court will allow Plaintiffs' Sur–Reply.